Filed 4/10/13  P. v. Segrest CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D060690 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD222967 Super. Ct. No. SCD232213) |
| IMSHAY RAYMONE SEGREST, | |
| Defendant and Appellant. | |

APPEAL from judgments of the Superior Court of San Diego County, Amalia L. Meza, Judge.  Judgment in case No. SCD222967 affirmed as modified, with directions. Judgment in case No. SCD232213 affirmed.

INTRODUCTION

This appeal involves two cases:

*Case No. SCD222967* (*firearm possession case*)

In March 2010 Imshay Raymone Segrest pleaded guilty in case No. SCD222967 to one count of possession of a firearm by a felon (Pen. Code, § 12021, subd. (a)(1)) (undesignated statutory references will be to the Penal Code) and admitted he had two

prison prior convictions within the meaning of sections 667.5, subdivision (b) and 668. In July of that year, the court placed Segrest on three years of formal probation and suspended imposition of sentence for that period of time.

In April 2011 the court revoked Segrest's probation based on evidence admitted at the preliminary hearing held in case No. SCD232213 (discussed, *post*), in which he was charged with two counts of committing a forcible lewd act upon his cousin, D.E., a child under the age of 14 years, in violation of section 288, subdivision (b)(1) (hereafter § 288(b)(1)).

*Case No. SCD232213 (forcible lewd act case)*

In August 2011 a jury convicted Segrest in case No. SCD232213 of one count of committing a forcible lewd act upon D.E., a child under 14 years of age, in violation of section 288(b)(1), as charged in count 1. The jury found not true a count 1 allegation that Segrest committed the lewd act during the commission of a residential burglary within the meaning of section 667.61, subdivisions (a), (c), and (d). The jury found Segrest not guilty of a second count of committing a forcible lewd act upon D.E., as charged in count 2. Thereafter, Segrest admitted he had four probation denial priors (§ 1203, subd. (e)(4)) and two prison priors (§§ 667.5, subd. (b), 668).

*Sentencing hearing for both cases*

In early October 2011 the court sentenced Segrest in the forcible lewd act case to a total prison term of 12 years, consisting of the upper term of 10 years for the section 288(b)(1) conviction, plus two one-year enhancements for the two prison priors (§§ 667.5, subd. (b), 668).

2

At the same hearing, the court then sentenced Segrest in the firearm possession case to the middle prison term of two years and ordered that he serve this sentence concurrently with the 12-year sentence imposed in the forcible lewd act case.  The court again imposed, but stayed under section 654, two one-year enhancements for Segrest's two prison priors.

*Contentions*

Segrest appeals, contending (1) the court prejudicially erred in the forcible lewd act case by failing to sua sponte instruct the jury under CALCRIM No. 3425 regarding the defense of unconsciousness; and (2) in sentencing him in the firearm possession case, the court should have stricken the two prison prior allegations, and it thus erred by imposing and then staying under section 654 the two one-year enhancements for Segrest's two prison priors that the court had already imposed in the forcible lewd act case.  The Attorney General agrees the court should have stricken the two prison allegations in the firearm possession case.

We modify the judgment in the firearm possession case by striking the two one-year prison prior enhancements imposed and stayed in that case and affirm the judgment as so modified with directions.  We affirm the judgment in the forcible lewd act case.

FACTUAL BACKGROUND

A. *Firearm Possession Case* (*No. SCD222967*)

Segrest, who had been convicted of a felony, unlawfully possessed and controlled a firearm.[1]

B. *Lewd Act Case* (*No. SCD232213*)

1. *The People's case*

Segrest is the nephew of the victim's father in this case. His cousin, D.E., was 13 years old at the time of the August 2011 trial in this matter and was living with her father when the sexual assault charged in this case occurred early in the morning on January 29, 2011.[2] D.E. is developmentally disabled and has a speech impediment.

*D.E.'s testimony*

D.E. testified at trial that Segrest came into her bedroom and poked her in the arm to wake her up. He was lying on the bed next to her. Segrest said "hi" to her and asked about her father. D.E. testified she remembered Segrest saying he wanted to do something with her. However, when the prosecutor asked her what Segrest said he wanted to do, D.E. replied, "I don't know." D.E. then denied that Segrest said he wanted to have sex with her.

D.E. also testified that Segrest caused her to fall to the floor. She landed on her back, and Segrest was on the floor next to her. Segrest pulled off D.E.'s sweatpants. He

---

[1]     This brief factual statement, which is taken from Segrest's guilty plea form, served as the factual basis for his guilty plea in this case.

[2]     All further dates are to calendar year 2011.

4

then ripped her panties. D.E. told Segrest she wanted to go to the bathroom, but he told her "no."

Reminding D.E. that she had testified at the preliminary hearing in this matter,[3] the prosecutor asked her whether Segrest ended up on top of her. D.E. first replied that Segrest did not get on top of her, then she stated she did not remember, and then she again denied that he got on top of her. When asked whether Segrest touched any part of her body, D.E. answered, "No." D.E. acknowledged that she had spoken to the police, and that she told them Segrest had "humped' her.

After the court held a sidebar conference with the prosecutor and defense counsel, D.E. stated in the presence of the jury, "I don't remember nothing." The prosecutor asked whether she was afraid, and she replied she was afraid of Segrest. D.E. testified she remembered crying out and yelling at Segrest to stop and get off of her. She then acknowledged she told a detective that Segrest had touched her on her breast. D.E. testified she was wearing a T-shirt when Segrest touched her breast. She also testified that Segrest told her to "shut up." When asked why she did not just get up and go to the bathroom, D.E. replied, "Because he had my arm." The prosecutor again asked, "Was his body on top of yours?" D.E. again replied, "I don't remember."

D.E. also testified she told Segrest that she thought her dad was coming in, but when the prosecutor asked her whether she remembered her dad coming into the bedroom, D.E. replied, "No." She then testified she was on the floor when her dad came

---

[3]    D.'s preliminary hearing testimony, which was read to the jury, is discussed, *post*.

in, and Segrest was next to her on the floor. Her panties had already been ripped when her father came in. The prosecutor asked D.E. about numerous statements the prosecutor said she had made to others about what happened in the bedroom, and D.E. repeatedly replied, "I don't remember."

*D.E.'s Father*

D.E.'s father testified that three other people were in the house when he went to bed at around 2:00 a.m. that night: D.E., his girlfriend, and his son. He did not expect anyone else to come over that night. D.E.'s father testified he woke up when he heard D.E. yelling, "No, leave me alone," "Stop," and, "Get out of here." When he went to D.E.'s bedroom, he saw that the bedroom door was closed. D.E. usually slept with the door open.

Her father testified that when he opened the bedroom door, he saw D.E. and Segrest on the floor. D.E. was on her back, and Segrest was lying on top of her. D.E.'s legs were slightly spread apart and Segrest was lying down between her legs in what her father considered a sexual position. He testified he did not see any sweatpants on D.E., who was moving her shoulders from side to side trying to throw Segrest off of her. He could see Segrest's boxer shorts. He testified he angrily pulled Segrest off of D.E. and threw him towards the bedroom door.

On cross-examination, D.E.'s father testified that Segrest was not moving when he pulled Segrest off of D.E. Defense counsel asked whether Segrest was "like a deadweight." Her father replied, "Yeah, like he was—like he was asleep, like, asleep on top of her." He stated he could see that Segrest was wearing boxers underneath his pants,

6

but he could not see whether D.E. was wearing underpants because most of her thighs were covered by her gown. He testified that Segrest did not appear to recognize him and seemed "spaced out." He testified he asked Segrest, "What are you doing to my daughter?"

On redirect examination, D.E.'s father acknowledged that when he told Segrest he was going to call the police, Segrest angrily punched a hole in the wall, left the house, and sped off in his car. He also acknowledged that when he heard Segrest drive away, he did not hear Segrest crash into anything. The prosecutor asked him whether he remembered telling a detective that when he saw Segrest on top of D.E., Segrest's pants were so low his penis could have been out. He replied, "Yes, I remember." He stated he could see Segrest's boxers and his "butt cheeks at the top."

On recross-examination, defense counsel asked D.E.'s father, "So you're not trying to protect [Segrest] here?" He replied, "No, no, no, not at all."

*Dr. Adams*

Dr. Joyce Adams, a pediatrician and child abuse pediatrician specialist, testified she examined D.E. on January 29 at Rady's Children's Hospital in San Diego. She was unable to get a close look at D.E.'s hymen because D.E. did not tolerate that part of the examination. Dr. Adams did not see any signs of injury when she examined D.E.'s vagina. She testified that "most of the time with adolescent girls, even if they have recently had intercourse or been sexually assaulted involving penis and vagina, most of the time we don't see any injuries." The prosecutor asked, "Why is that?" Dr. Adams responded, "Because the hymen is so stretchy." The prosecutor asked, "So a person can

7

struggle and something can be inserted into their vagina, and you can still not have any findings?" Dr. Adams answered, "Correct."

*Detective Albrecht*

Leslie Albrecht, a detective with the San Diego Police Department, testified that she interviewed D.E.'s father on February 1. The father told her he was so emotional when he walked into the bedroom that he did not really notice whether Segrest's penis was out of his pants. However, he told her that Segrest's pants were so low that his penis could have been out without his unbuckling or unzipping his pants.

Detective Albrecht also testified that she interviewed D.E. at her school. The interview, which was recorded on videotape, took place on February 1. A portion of the videotape recording, which was later received in evidence, was played for the jurors, who were given copies of a transcript of the interview.[4] D.E.'s statements to Detective Albrecht were largely consistent with her preliminary hearing testimony, her statements to Officer Daniel Brent (discussed, *post*), and portions of the testimony she reluctantly gave at trial (discussed, *ante*). For example, D.E. told Detective Albrecht that Segrest took off her "night" pants and "ripped" off her panties and threw them on the floor. D.E. also told Detective Albrecht that when she tried to push Segrest off of her, he held her down by holding her wrists. She said Segrest "cussed me out. He called me bitch, ho." When Detective Albrecht asked D.E. what Segrest did to her, D.E. answered, "He like

---

4    The parties stipulated at trial that the transcript of D.E.'s February 1 interview, which was marked for identification as exhibit 19A, would be received in evidenced and, thus, the court reporter did not need to report it.

8

put it in.  He, he went like—he like—he do like this, like hump, hump me."  Detective Albrecht asked D.E., "What is a penis?"  D.E. replied, "His dick."  When the detective asked whether Segrest "put that somewhere," D.E. responded, "Right here."  Detective Albrecht asked D.E. whether Segrest put it inside her, and D.E. replied, "Yeah."  Soon thereafter, the following exchange took place between Detective Albrecht and D.E.:

"[Detective Albrecht]: So where did he put his penis?

"[D.E.]:  Right here.

"[Detective Albrecht]:  [O]kay, so you['re] pointing to your, your private area?

"[D.E.]:  Yeah.

"[Detective Albrecht]:  Your girl area?

"[D.E.]:  Yeah.

"[Detective Albrecht]:  Do you understand what I mean by that?

"[D.E.]:  Mm-hm.

"[Detective Albrecht]: Do you know what the word 'vagina' is?

"[D.E.]:  Um, um, yeah.  [¶] . . .

"[Detective Albrecht]:  Okay.  So he, he—he put his dick . . . .

"[D.E.]:  Mm-hm.

"[Detective Albrecht]:   . . . into your privates?

"[D.E.]:  Mm-hm.

"[Detective Albrecht]:  Inside?

"[D.E.]:  Yeah."

9

D.E. also told Detective Albrecht that, after Segrest "put it in my thing," she asked Segrest why he was doing that to her, and Segrest said, "Sh, sh, hush, hush." D.E. then said to Detective Albrecht that when she told Segrest she was not going to hush or listen to him, Segrest slapped her face.

After the videotape was played for the jury, Detective Albrecht agreed with the prosecutor's observation that D.E. had made some gestures during the interview. The prosecutor asked whether D.E. was making some gestures when she told Detective Albrecht that "[Segrest] like put it in. He, he went like—he like—he do like this, like hump, hump me." Detective Albrecht testified that D.E. was "gyrating her hips" backwards and forward when she made those statements. Detective Albrecht also testified that when she asked D.E. during the interview whether Segrest put his penis somewhere, D.E. was pointing to her vagina when she said he put it inside her "[r]ight here".

*Officer Brent*

Daniel Brent, an officer with the San Diego Police Department, testified that he took D.E.'s statement in her bedroom. D.E. told him that Segrest came into the bedroom when she was asleep and pushed her off the bed. D.E. said that when she tried to scream, Segrest covered her mouth with his hand. D.E. said Segrest took off her sweatpants, and she indicated that Segrest fondled her breasts. D.E. told Officer Brent that Segrest ripped off her underpants, threw them across the room, and then humped her. Officer Brent testified that when D.E. told him Segrest had humped her, she put her hands up in the air

10

and rocked her hips forward and backwards. Officer Brent interpreted her gestures to mean that Segrest had sex with her.

D.E. also told Officer Brent that she told Segrest he was going to go to jail, and Segrest said, "Shut the fuck up, bitch." D.E. also told Officer Brent that Segrest held her wrists down and was on top of her when her dad came in and grabbed him off of her.

*D.E.'s prior testimony at the preliminary hearing*

The transcript of D.E.'s April 15 preliminary hearing testimony was read to the jury. At that hearing, D.E. testified she was asleep when Segrest woke her up. She was wearing sweatpants, underpants, a bra, and a long-sleeved T-shirt. Segrest asked D.E. where her sister was and also asked, "How's your day?" Segrest told her he was going to have sex with her. D.E. told him, "No," and he pushed her to the floor. Segrest took off D.E.'s sweatpants and ripped off her underpants. When D.E. told him she wanted to call her dad, Segrest said, "Don't," and told her, "Shut up," using curse words. Segrest was on top of her and she could not get up because he was holding her down. D.E. heard her father call her, and she told Segrest she had to get up. Segrest said, "No," put his hand over her mouth and then touched her breast.

When the prosecutor asked D.E. whether Segrest touched any other part of her body, she pointed down to what the prosecutor referred to as her "private parts." The prosecutor asked whether Segrest put something in her "private." D.E. replied, "Yeah," but when asked what Segrest put in there, she answered, "I don't want to say it." Showing D.E. a doll, the prosecutor asked her, "Can you point to the part on the boy

11

doll?" D.E. responded, "Right there," pointing to what the prosecutor referred to as the "crotch area."

D.E. testified that Segrest was still on top of her and her pants were still off when her father came into the bedroom. Her father was mad when he pulled Segrest off of her. D.E. indicated she stayed in the bedroom, but heard yelling and later saw a hole in the wall.

After reminding D.E. on redirect examination that they had talked about saying things that are true, the prosecutor asked her, "Is it true that [Segrest] got on top of you and put his . . . parts inside of you?" D.E. answered, "Yeah."

B. *Defense case*

*Segrest's direct examination testimony*

Segrest testified that on January 28, late at night, he went to a bar with his girlfriend and a few other people. He had a couple of vodka and orange juice drinks, and two or three gin and orange juice drinks. His girlfriend went home, and Segrest put his drink down while hanging out outside the bar. Segrest testified that when he finished his drink, he noticed what "looked like ashes floating at the bottom." He also testified he smoked cigarettes, and "a lot of times you might be smoking, and the ash will fall in your drink." Defense counsel asked Segrest whether he started to feel differently after he finished the drink, and Segrest replied, "I did, but I figured it was just the alcohol."

Segrest stated he left the bar and went to a gathering of people at a friend's house. He was given a ride home, but felt "kind of excited" and "ready to party." Segrest got the car keys and, feeling "perfectly fine" to drive his car, drove back to the gathering and

12

stayed there for about 20 or 30 minutes until others suggested they all go to Segrest's uncle's house to play pool.

Segrest testified he drove alone to his uncle's house, but none of the other people came. He went into the house, decided to lie on the couch, and smoked a cigarette. He went to sleep and the next thing he remembered was his uncle waking him up in the hallway. Segrest testified he did not know "off the top" where he was, and he felt like he was "in a deep sleep." He was surprised his uncle was asking him, "What did you do to my daughter?" Segrest hit the wall because he got upset when his uncle said he was going to call the police. Segrest stated he then left the house because his uncle was "just going off," and he did not believe what his uncle was saying.

Segrest drove to his mother's house after he left his uncle's house. His mother drove him to a gas station to get him some cigarettes, then to the beach, and eventually home, where she explained to Segrest's girlfriend what was going on. Segrest's girlfriend pulled his clothes off and checked both his clothes and his body. Segrest testified he slept the rest of that day, which was a Saturday, got up in the afternoon on Sunday to eat, and then went back to bed and slept through the night. Monday afternoon he received a visit from his probation officer, and he was arrested the next day.

*Segrest's cross-examination testimony*

On cross-examination, Segrest acknowledged he was convicted in 2004 of felony evasion from a police officer, he was convicted in 2010 of being a felon in possession of a firearm, and he had previously taken the drug Ecstasy. The prosecutor asked him, "Did you rape anybody last time you did it?" Segrest replied, "I didn't rape nobody [*sic*] this

13

time." When asked whether he had a blackout the last time he used Ecstasy, he answered, "No." The prosecutor asked, "Did you forget what you did?" Segrest responded, "Not that I recall."

The prosecutor then asked Segrest numerous questions about what he did before he went into D.E.'s bedroom and what happened after D.E.'s father pulled him off of her and pushed him into the hallway, and Segrest provided detailed answers. Segrest repeated his testimony that he did not remember going into D.E.'s bedroom. He acknowledged that after her father found him on top of D.E., he and D.E.'s father had a conversation in the living room, during which he (Segrest) smoked a cigarette until it was finished. Segrest again acknowledged he punched a big hole in the wall after her father said he was going to call the police.

As shown by the following exchange with the prosecutor, Segrest also acknowledged that although he remembered what he did before and after he entered D.E.'s bedroom, he had no memory of going into the bedroom or of anything that may have happened in there:

> "[Prosecutor]: Now, you're saying that you remember every detail up until the point where you go into [D.E.'s] room and get on top of her. Fair to say? That's the only part of the night you don't remember?
>
> "[Segrest]: I don't remember it.
>
> "[Prosecutor]: You remember who was at the parties you were at. You remember how you got to [your uncle's house]. You remember . . . .
>
> "[Segrest]: I didn't . . . .

14

"[Prosecutor]: -- what you did when you got to [your uncle's]. You remember what happened before you left [your uncle's].

"[Segrest]: Uh-huh.

"[Prosecutor]: The only missing piece we have is when you're on top of [D.E.] and her pants are ripped off.

"[Segrest]: Uh-huh.

"[Prosecutor]: 'Yes'?

"[Segrest]: Huh?

"[Prosecutor]: 'Yes'?

"[Segrest]: Yes."

*Segrest's mother*

Segrest's mother testified that when Segrest drove to her home early in the morning on January 29, he was "panicky," "loud," and "hyper." She thought he was on drugs. When she took him to the beach in the car, she smelled alcohol on his breath. When he began to calm down, she called his girlfriend and drove him home.

On cross-examination, Segrest's mother acknowledged she never told the police that Segrest appeared to be under the influence of some kind of drug on the morning of January 29. She never thought she should take him to the hospital.

*Segrest's girlfriend*

Segrest's girlfriend testified she was with him at the bar when he was drinking during the evening on January 28. She fell asleep in the car outside the bar at around 2:00 a.m. and when he woke her up sometime later he told her to go home and he would find a ride home. He seemed "a little hyper," but did not appear to be "falling-down

15

drunk." She testified she went home and fell asleep. Segrest came home later and woke her up to get the car keys. At that time, Segrest seemed hyper, he was moving a lot, and he was not himself.

Segrest's girlfriend also testified she had previously taken Ecstasy pills, and she thought Segrest might have taken an Ecstasy pill. When she saw him the next morning, he was crying a lot, could not control himself, was shaking, and his eyes were rolling. Allen testified she believed Segrest "was still on the drug." She stated she smelled his penis and his fingers, but he did not smell like somebody who had just had sex.

DISCUSSION

I. *CLAIM OF INSTRUCTIONAL ERROR* (*CASE NO. SCD232213*)

Segrest first contends the judgment in the forcible lewd act case should be reversed because the court prejudicially erred by failing to sua sponte instruct the jury under CALCRIM No. 3425 regarding the defense of unconsciousness.[5] We conclude the court did not err.

---

[5] CALCRIM No. 3425 states: "The defendant is not guilty of _____ <insert crime[s]> if (he/she) acted while legally unconscious. Someone is legally unconscious when he or she is not conscious of his or her actions. [Someone may be unconscious even though able to move.] [¶] Unconsciousness may be caused by (a blackout[,]/[or] an epileptic seizure[,]/[or] involuntary intoxication[,]/[or] sleepwalking[,]/[or] _____ <insert a similar condition>). [¶] The People must prove beyond a reasonable doubt that the defendant was conscious when (he/she) acted. If there is proof beyond a reasonable doubt that the defendant acted as if (he/she) were conscious, you should conclude that (he/she) was conscious. If, however, based on all the evidence, you have a reasonable doubt that (he/she) was conscious, you must find (him/her) not guilty."

16

A.  *Background*

The court properly instructed the jury that the specific intent element of the crime of committing a forcible lewd act upon a child under the age of 14 years (§ 288(b)(1)) charged in counts 1 and 2 required proof that the defendant committed the act with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of himself or the child.  (See § 288, subds. (a), (b)(1).)

The court also instructed the jury under CALCRIM No. 3426 regarding the limited permissible use of any evidence that Segrest was *voluntarily* intoxicated at the time the charged crimes were committed; and under CALCRIM No. 3427 regarding the jury's use of any evidence he was *involuntarily* intoxicated at the time those crimes were committed.  Both of those instructions informed the jurors they could consider any evidence of intoxication in deciding whether Segrest acted with the requisite intent.  (See CALCRIM Nos. 3426 ["You may consider evidence, if any, of the defendant's voluntary intoxication . . . in deciding whether the defendant acted with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of himself or the child[.]"] & 3427 ["Consider any evidence that the defendant was involuntarily intoxicated in deciding whether the defendant had the required intent when he acted."].)

The defense did not request, and the court did not sua sponte give, an instruction on the defense of unconsciousness.  The jury convicted Segrest of committing a forcible lewd act upon D.E. in violation of section 288(b)(1) as charged in count 1.

17

B.  *Applicable Legal Principles*

"""It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence.  [Citations.]  The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case."""  (*People v. Breverman* (1998) 19 Cal.4th 142, 154, quoting *People v. St. Martin* (1970) 1 Cal.3d 524, 531.)

"The duty to instruct, *sua sponte*, on general principles closely and openly connected with the facts before the court also encompasses an obligation to instruct on defenses, including self-defense and *unconsciousness*, and on the relationship of these defenses to the elements of the charged offense."  (*People v. Sedeno* (1974) 10 Cal.3d 703, 716, second italics added.)

"Among those persons deemed incapable of committing a crime are individuals who 'committed the act charged without being conscious thereof.'  (§ 26, class four.)  Unconsciousness, when not voluntarily induced, is a complete defense to a charged crime.  [Citations.]  'Unconsciousness does not mean that the actor lies still and unresponsive.  Instead, a person is deemed "unconscious" if he or she committed the act without being conscious thereof.' "  (*People v. Rogers* (2006) 39 Cal.4th 826, 887.)

"A trial court must instruct on unconsciousness on its own motion if it appears the defendant is relying on the defense, or if there is *substantial evidence* supporting the defense and the defense is not inconsistent with the defendant's theory of the case."  (*People v. Rogers*, *supra*, 39 Cal.4th at p. 887, italics added.)  "Substantial evidence is

18

evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive." (*People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8, quoting *People v. Flannel* (1979) 25 Cal.3d 668, 684, disapproved on other grounds in *In re Christian S.* (1994) 7 Cal.4th 768.)

A "defendant's own testimony that he could not remember portions of the events, standing alone, [is] insufficient to warrant an unconsciousness instruction." (*People v. Rogers*, *supra*, 39 Cal.4th at p. 888; *People v. Coston* (1947) 82 Cal.App.2d 23, 40 ["[A] defendant's mere statement of forgetfulness, unsupported by any other evidence, is at most very little evidence of unconsciousness at the time of performing a particular act."].)

C. *Analysis*

The trial record shows Segrest did not rely on a defense that he was unconscious when he allegedly committed the forcible lewd act charged in count 1. Rather, as Segrest points out, he relied on the alternate defense theories that (1) the assault did not occur; (2) D.E.'s pretrial accusatory statements were not truthful and she was "confabulating" when she made those statements; and (3) even assuming the assault occurred, the prosecution failed to prove he acted with the requisite specific intent because the evidence showed he was voluntarily under the influence of alcohol and involuntarily under the influence of an "ashy" drug he claimed someone put in one of his drinks at the bar.

Thus, as Segrest did not rely on a defense of unconsciousness, the court had a duty to sua sponte instruct the jury on unconsciousness only if (1) substantial evidence—that is, evidence a reasonable jury could find persuasive—supported that defense, and (2) the unconsciousness defense was not inconsistent with his theory of the case. (*People v.*

19

*Rogers*, *supra*, 39 Cal.4th at p. 887; see *People v. Barton*, *supra*, 12 Cal.4th at p. 201, fn. 8.)

We conclude Segrest has failed to meet his burden of showing that substantial evidence supports the giving of an instruction on the defense of unconsciousness in this case, and, thus, he has failed to establish that the court erred by failing to sua sponte give such an instruction. First, as the Attorney General correctly points out, there is no evidence the ashy substance that Segrest testified he found at the bottom of the glass he had put down at the bar was indeed a drug, let alone a drug that would cause him to lose consciousness. Segrest's own testimony shows he consumed at least five drinks containing vodka and gin at the bar. He testified that when he finished the drink in question, he noticed what looked like ashes floating at the bottom. However, he also testified he was a smoker, and he acknowledged that a lot of times you might be smoking, and the ash will fall in your drink. Although Segrest testified he started to feel differently after he finished the drink, he thought it was just the alcohol. The defense presented no expert testimony to show Segrest had been drugged with something other than alcohol, and the testimony of his girlfriend that he might have been drugged with an Ecstasy pill was speculation.

Second, Segrest's testimony about his claimed memory lapse, alone, did not support the giving of an unconsciousness instruction. (*People v. Rogers*, *supra*, 39 Cal.4th at p. 888; *People v. Coston*, *supra*, 82 Cal.App.2d at p. 40.) In this regard, we note (as discussed in detail, *ante*, in the factual background) that Segrest acknowledged at trial that he had a clear memory of what he did before and after he entered D.E.'s

20

bedroom, but claimed he had no memory of going into the bedroom or of anything that may have happened in there.

Third, Segrest's claim that "third-party verification of [his] altered state" provided evidence supporting an unconsciousness instruction, is unavailing. Segrest first relies on the testimony of his uncle that when his uncle pulled him off of D.E., it was "like [Segrest] was asleep on top of her," and Segrest seemed "spaced out" and disoriented. However, his uncle's testimony is not substantial evidence that Segrest was unconscious. His uncle testified he woke up and went into D.E.'s bedroom when he heard her yelling, "No, leave me alone," "Stop," and, "Get out of here." Even though D.E. was a reluctant prosecution witness at trial, she testified that she remembered crying out and yelling at Segrest to stop and get off of her, and she acknowledged that Segrest cursed at her and told her to "shut the fuck up." It is clear that the jury, by rejecting Segrest's voluntary and involuntary intoxication defenses and finding he forcibly committed a lewd act on D.E. with the requisite specific intent (discussed, *ante*), believed Segrest froze and pretended to be asleep or unresponsive when he realized his uncle was about to come into the bedroom in response to D.E.'s yelling.

In support of his third-party verification claim, Segrest also relies on the testimony of his mother that he was hyper and she thought he was on drugs; and on the testimony of his girlfriend, that he appeared hyper, he "wasn't hisself [*sic*]," and he was shaking. However, being hyper or not being oneself or shaking is not the test for unconsciousness. (See CALCRIM No. 3425 ["Someone is legally unconscious when he or she is not conscious of his or her actions."].) The testimony of Segrest's mother that she thought he

was on drugs, like the testimony of his girlfriend that he might have been drugged with an Ecstasy pill, was speculation.

To be substantial, testimony supporting an unconsciousness instruction must be "evidence that a reasonable jury could find persuasive." (*People v. Barton*, *supra*, 12 Cal.4th at p. 201, fn. 8.) Here, the evidence on which Segrest relies—specifically, his own testimony and that of his uncle, his mother, and his girlfriend—is not evidence a reasonable jury could find persuasive. As already noted, the jury considered the testimony Segrest presented in support of his involuntary intoxication defense and rejected that defense. For all of the foregoing reasons, we conclude the court did not err by failing to sua sponte instruct the jury under CALCRIM No. 3425 regarding the defense of unconsciousness.

## II. *SENTENCING ERROR* (*CASE NO. SCD222967*)

Segrest also contends that in sentencing him in the firearm possession case the court should have stricken the two prison prior allegations, and, thus, the court erred by imposing in that case, and then staying under section 654, the two one-year enhancements for Segrest's two prison priors that the court had already imposed in the forcible lewd act case.

The Attorney General agrees the court should have stricken the two prison allegations in the firearm possession case and asks this court to modify the judgment by striking the prison prior enhancements imposed and stayed in that case and to affirm the judgment as modified.

A one-year prison prior enhancement (§ 667.5, subd. (b)) relates to the status of the offender, rather than the nature of the offense, and therefore may be "added only once as a step in arriving at the aggregate sentence." (*People v. Tassell* (1984) 36 Cal.3d 77, 90, overruled on other grounds in *People v. Ewoldt* (1994) 7 Cal.4th 380, 400-401; see also *People v. Garrett* (1991) 231 Cal.App.3d 1524, 1527 & § 1170.1.)

Here, in sentencing Segrest to the aggregate prison term of 12 years at the same hearing for his convictions in the forcible lewd act and firearm possession cases, the court imposed the two one-year prison prior enhancements in the forcible lewd act case and then impermissibly imposed (but stayed under § 654 the execution of) the same two enhancements in the firearm possession case. Accordingly, we conclude the imposition of the two one-year prison prior enhancements in the firearm possession case must be stricken from judgment in that case, and the abstract of judgment must be corrected to reflect that modification.

                                DISPOSITION

The judgment in case No. SCD232213 is affirmed. The two one-year prison prior enhancements (§§ 667.5, subd. (b), 668)) imposed and stayed in case No. SCD222967 are stricken. As modified, the judgment in that case is affirmed. The trial court is directed to prepare a corrected abstract of judgment reflecting the striking of

                                    23

those enhancements and to forward a certified copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.


                                                NARES, J.

WE CONCUR:


HUFFMAN, Acting P. J.


McDONALD, J.